VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF VIRGINIA BEACH

ANTI-AGING SOLUTIONS, INC.

Plaintiff,

v.

ALMA LASERS, INC., formerly known as ORION LASERS, INC. CL08-1247

Serve: CT Corporation System, Registered Agent
4701 Cox Road, Suite 301
Glen Allen, VA 23060

Defendant.

**COMPLAINT**

The Plaintiff, Anti-Aging Solutions, Inc. ("Anti-Aging"), by counsel, files its Complaint against the Defendant, Alma Lasers, Inc. ("Alma Lasers"), formerly known as Orion Lasers, Inc., seeking a judgment against Alma Lasers in the amount and on the grounds as set forth below:

1. Anti-Aging is incorporated under the laws of the Commonwealth of Virginia and has a principal place of business in Virginia Beach, Virginia.

2. Alma Lasers is incorporated under the laws of the State of Delaware and has a principal place of business in Buffalo Grove, Illinois. Alma Lasers is registered with Virginia's State Corporation Commission as a foreign corporation licensed to transact business within the Commonwealth of Virginia. Alma Lasers has a registered agent in Virginia, which is CT Corporation, 4701 Cox Road, Suite 301, Glen Allen, VA 23060. At all times relevant to the allegations contained in this Complaint, Alma Lasers sold products within the Commonwealth of Virginia and thus transacted business within this Commonwealth. Therefore, this Court can exercise personal jurisdiction over Alma Lasers pursuant to Virginia Code Ann. § 8.01-328.1(A) (1) & (2).



3.     Alma Lasers' corporate name was formerly Orion Lasers, Inc.  By Certificate of Amendment that was filed with the Secretary of State of the State of Delaware on October 20, 2005, Orion Lasers, Inc. amended its Certificate of Incorporation to change its name from Orion Lasers, Inc. to Alma Lasers, Inc.

4.     For the purposes of the allegations contained in this Complaint, Orion Lasers, Inc. and Alma Lasers, Inc. are the same corporation.

5.     By contract dated July 1, 2004, Anti-Aging entered into a Sales Representative Agreement ("the Agreement") with Orion Lasers, Inc.   A copy of the Agreement is attached to this Complaint as Exhibit A and is made a part of this pleading.  Pursuant to Paragraph 2.1 of the Agreement, Orion Lasers, Inc. appointed Anti-Aging as its exclusive sales representative for the company's products in the "Territory", as defined in Exhibit D to the Agreement.  Anti-Aging's Territory consisted of Virginia, West Virginia, and the District of Columbia.  Paragraph 3.1 of the Agreement stated that Anti-Aging was to solicit orders for the sale of company products at such prices as contained in the standard price list that was attached to the Agreement as Exhibit B.  Paragraph 5.1 of the Agreement stated that Anti-Aging's sole compensation for its services under the Agreement was the payment of a standard commission as set forth in the Commission Schedule attached to the Agreement, which was Exhibit A to the Agreement.  The Commission Schedule referred to the Price List, Exhibit B attached to the Agreement, and provided that the Sales Representative could offer any purchaser a discount on the sales price up to a maximum of ten per cent off the price shown on the Price List. The Commission Schedule provided that for each sale made, the Sales Representative would be paid a commission equal to 23% on 90% of the List Price for each product.  If the sales price exceeded 90% of the List Price, then Orion Lasers would pay the Sales Representative 50% of the amount that exceeded 90% of the List

Price. Paragraph 5.6 of the Agreement carved out an exception to the standard commissions to be paid to Anti-Aging if it sold products to a customer that was already part of a "National Account" with Orion Lasers. Paragraph 5.6 provided that if Anti-Aging sold any of the company's products to a customer within its Territory, and such customer was a National Account, then Anti-Aging would receive 75% of the standard commission. The remaining 25% of the standard commission would be paid to the National Accounts Manager. Paragraph 7.1 of the Agreement provided that the term of the Agreement was the date of the Agreement through June 30, 2006, unless terminated earlier pursuant to the provisions of Section 7 of the Agreement. Paragraph 7.2 of the Agreement provided that Orion Lasers, Inc. could terminate the Agreement upon written notice to Anti-Aging if Anti-Aging failed to meet any of the minimum volume targets established under Paragraph 2.2 of the Agreement. Either party could also terminate the Agreement upon written notice to the other if the other party had failed to comply with any material term of the Agreement, and such failure had not been cured after 30 days written notice from the terminating party.

6. In the months preceding the execution the Agreement on July 1, 2004, Orion Lasers was aware that Anti-Aging had strong connections to Sona Med Spas, a personal aesthetic health care franchise that had ambitious goals for growth. Before the execution of the Agreement, Cathie Hilton – the sole shareholder, director, officer, and employee of Anti-Aging - invited a representative of Sona Med Spas to a workshop in Scottsdale, Arizona for a demonstration of Orion Lasers' products. In addition, Hilton flew, at the expense of her company, that same representative to a meeting at Orion Lasers' corporate office in Fort Lauderdale, Florida, to further evaluate Orion's products and to have a private demonstration by Yariv Matzliach (then Vice President of Sales for Orion Lasers). From that point forward, Ms.

Hilton cultivated the relationship with Sona, ultimately culminating in Jim Amos (former CEO) and Heather Rose (former President) of Sona meeting in Florida in September 2004 to negotiate a national deal with Orion Lasers for the purchase of its products on a discounted basis. However, Orion Lasers' officers did not invite Ms. Hilton to attend the negotiation session. Ms. Hilton had no involvement in negotiating the prices at which Orion Lasers would sell it products to Sona Med Spas. Moreover, after the deal between Orion Lasers and Sona Med Spas was consummated, Yariv Matzliach told Ms. Hilton that he could not reveal to Ms. Hilton, or to any other Orion Lasers sales representatives, the prices at which Orion Lasers would sell its products to Sona Med Spas. Mr. Matzliach said that Sona Med Spas had requested the sales prices of such products remain confidential, so that Sona Med Spas' franchisees did not learn the information. Ms. Hilton later learned that this explanation was not true. Sona Med Spas did not request that the prices it was paying for such products from Orion Lasers remain confidential. Instead, it is Ms. Hilton's belief that Orion Lasers did not want to reveal the sales prices of such products so that it could pay a commission to its sales representatives that was *less than* the commission formula outlined in the Sales Representative Agreement, without telling Orion's sales representatives that it was changing the commission formula.

7. From the start of Anti-Aging's Sales Representative Agreement with Orion Lasers, the parties worked together to make Sona Med Spas a National Account. In November 2004, Ms. Hilton's efforts to establish a sales relationship with Sona Med Spas bore fruit. Sona Med Spas began purchasing Orion Lasers products, and those purchases continued into 2005 and 2006. As Sona Med Spas began purchasing Orion Lasers products, Orion Lasers and Anti-Aging worked the Sona Med Spas account under the mutual understanding that Sona Med Spas was a National Account and Anti-Aging was the National Accounts Manager for Sona Med Spas.

8.     As Sona Med Spas purchased Orion Lasers products, Orion did, in fact, send commission checks to Anti-Aging. However, Anti-Aging could never confirm the accuracy of the commissions paid because it simply received checks from Orion Lasers, with a check stub indicating the commission paid, without showing the sales price of each product and without showing the mathematical calculation of how Orion Lasers arrived at the dollar amount of the sales commission.

9.     In fact, Anti-Aging did not receive the correct amount of the commission that was due it, pursuant to Exhibit B in the Agreement, on the sale of each product to Sona Med Spas. Because Anti-Aging was the National Accounts Manager for the Sona Med Spas account, Anti-Aging should have received 25% of a 23% commission, based on the sales price of each product, on sales of all Orion products that occurred outside of her Territory. If the sale occurred inside her Territory, then Anti-Aging should have received the full 23% commission. Instead, Anti-Aging later determined that it was receiving only 25% of a 15% commission on out-of-Territory sales of each Orion Lasers product to Sona Med Spas.   On its in-Territory sales, Anti-Aging received only a 15% commission, instead of the standard 23% commission due under the terms of the Agreement.

10.     Anti-Aging's sales efforts resulted in sales of Orion Lasers products to Sona Med Spas totaling just under four million dollars.   Anti-Aging should have received commissions totaling $336,397.90. Instead, Anti-Aging received payments totaling $174,721.79 in commission checks. After Orion Lasers changed its name to Alma Lasers, the company sent a wire transfer of $21,298.10 on January 10, 2007 to Anti-Aging's bank account, along with an accompanying e-mail from Miriam Freyer, Director of Finance and Administration for Alma Lasers, a copy of which is attached to this Complaint as Exhibit B and is made a part of this

pleading, confirming that the wire was sent as payment for disputed commissions without any condition of acceptance that it was a full and final payment of the commissions in dispute. Anti-Aging has also credited the sum of $13,619.83 against the balance due in commissions. This amount represents the figure that Anti-Aging owed to Alma Lasers for the purchase of its demo unit. Finally, Anti-Aging has added to the balance due the sum of $1,800 that was erroneously deducted from one of its commission checks, with the explanation that it was reimbursement for "training expenses". The Sales Representative Agreement mentions nothing about sales reps being liable for training expenses. Thus, the principal amount of Anti-Aging's claim against Alma Lasers currently stands at $128,558.18.

11. In January 2006, after Orion Lasers changed its corporate name to Alma Lasers, Inc., Alma terminated Anti-Aging on the pretext that Anti-Aging had failed to maintain the minimum volumes that were established for the fourth quarter of calendar year 2005.

12. After Alma Lasers fired Anti-Aging as a Sales Representative, Anti-Aging demanded that Alma Lasers provide it with a full accounting of Sona's purchases of Alma (formerly Orion) Lasers products. As of the date of the filing of this Complaint, Alma Lasers has not provided such an accounting.

13. Based upon the allegations contained in the preceding Paragraphs, Orion Lasers, Inc., which later changed its name to Alma Lasers, Inc., breached its Agreement with Anti-Aging by paying it commissions that were less than the commissions outlined in Exhibits A and B to the Agreement. Anti-Aging has suffered damage as a result of Alma Lasers' breach of contract, namely, the monetary difference between the commissions it should have received and the commissions it actually received.

WHEREFORE, the Plaintiff, Anti-Aging Solutions, Inc., prays that this Court enter judgment against the Defendant, Alma Lasers, Inc., formerly known as Orion Lasers, Inc., in the amount of $150,000.00, plus an award of pre-judgment interest at the legal rate from the date that Anti-Aging Solutions, Inc. should have received the full commission on each sale, plus its taxable court costs incurred in this cause of action.

ANTI-AGING SOLUTIONS, INC.

By: ______________________
Of Counsel

David M. Zobel, Esq.
VSB No. 23298
Huff, Poole & Mahoney, P.C.
4705 Columbus Street
Virginia Beach, VA 23462
(757) 499-1841 Phone
(757) 552-6016 Facsimile





**SALES REPRESENTATIVE AGREEMENT**

THIS SALES REPRESENTATIVE AGREEMENT (the "Agreement") is made as of July 01, 2004, by and between Orion Lasers, Inc., whose principal place of business is located at 6555 North Powerline Road, Suite 303, Fort Lauderdale, Florida 33309 (the "Company"), and Anti-Aging Solutions, Inc. ("Representative"), whose principal offices are located at 1102 Gleaning Close, Virginia Beach, VA 23455.

In consideration of the mutual covenants set forth herein, the parties agree as follows:

1. Definitions.

As used in this Agreement, the following words shall have the following meanings:

1.1 "Commission Schedule" shall mean the Company's commission schedule applicable to Products (as hereinafter defined), as set forth in Exhibit A.

1.2 "Exclusive", with respect to rights granted to Representative herein, shall mean only that the Company shall not, during the term of this Agreement, appoint any person or entity, other than Representative and the Company's own employees, authorized to solicit orders, directed to the Company, from prospective customers located in the "Territory" (as defined below), except as expressly provided under Section 2.1 of this Agreement.

1.3 "National Account" shall mean any customer or prospective customer located within the Territory that operates more than ten (10) clinics and that operates clinics both within the Territory and outside the Territory. Notwithstanding the foregoing, any individual clinic or other facility located outside the Territory that is operated by a customer or prospective customer constituting a National Account shall not be deemed to be located within the Territory.

1.4 "Net Invoice Price" shall mean the price invoiced by the Company on an order for Products, less any trade discounts or cash discounts taken, and less any charges for freight, financing, late payment, insurance, taxes, fees (including, but not limited to, finder's fees paid to third parties), duties and the like.

1.5 "Product" or "Products" shall mean those products, goods and services manufactured, marketed or provided by the Company and listed in Exhibit B hereto, as revised from time to time by the Company upon written notice to Representative.

1.6 "Standard Terms and Conditions" shall mean Company's standard terms and conditions of sale, as the same may be revised from time to time by Company upon written notice to Representative. A copy of the Standard Terms and Conditions currently in effect is attached hereto as Exhibit C.

1.7 "Territory" shall mean that geographic area described in Exhibit D hereto.

cws



2. Appointment, Authority and Responsibilities of Representative.

2.1 Subject to the terms of this Agreement, Company hereby appoints Representative as its exclusive sales representative for the Products in the Territory. Representative hereby accepts said appointment, and agrees to use its best efforts to promote the Products and solicit orders therefor from customers in the Territory. Representative shall not promote or solicit orders for Products from customers outside the Territory. Company reserves the right to (a) make direct sales of Products to customers in the Territory, and (b) to place the Products with educational, research or similar institutions and practitioners in the Territory for any purpose, including research and promotion, in either case without compensation of any kind to Representative. Company further reserves the right to authorize any of its other sales representatives to organize regional symposia or workshops approved in advance by Company, which may be attended by prospective customers from the Territory, and to solicit orders for Products from such prospective customers at any such symposium or workshop. In the event that a prospective customer located in the Territory places an order for Products as a result of any such symposium or workshop for which Representative would otherwise have earned a commission under Article 5 of this Agreement, Company shall pay a split commission in accordance with Section 5.5 of this Agreement to Representative and the sales representative that solicits such order. Company may from time to time authorize Representative to organize workshops or symposia within the Territory that may be attended by prospective customers from outside the Territory. If Representative solicits an order for Products from any such customer for which Representative would earn a commission hereunder if said customer were a customer in the Territory, then Company shall pay to Representative a split commission in accordance with Section 5.5 of this Agreement, provided that Company expressly authorized Representative in writing in advance to solicit orders from customers from outside the Territory at such symposium or workshop.

2.2 During each month, quarter and year of the term of this Agreement, Representative shall maintain such minimum volume for Product orders from customers in the Territory as established by mutual agreement of the parties pursuant hereto. The minimum volumes with respect to each month and quarter of the initial year of this Agreement, and for the initial year hereof, are set forth in Exhibit E hereto. Prior to each anniversary of the date hereof during the term of this Agreement, Company and Representative shall meet to discuss and mutually agree upon the minimum volumes for the following year, including each month and quarter of such year. If the parties are unable to reach an agreement within thirty (30) days after commencement of such meeting, then either party may terminate the Agreement upon written notice to the other party.

2.3 Representative is neither an employee of the Company nor, except for the solicitation of orders for Products from customers in the Territory, the Company's agent. Representative is not authorized to assume or create any obligation or responsibility, including, but not limited to, contractual obligations and obligations based on warranties or guarantees, on behalf or in the name of Company. Representative shall not misrepresent its status or authority nor hold itself out as an integrated part of or an entity affiliated with the Company in any way.

cws



2.4 Representative represents that it is neither an agent nor an employee of any prospective purchaser of Products and agrees to immediately notify the Company if Representative becomes such an agent or employee.

2.5 Unless otherwise expressly provided hereunder, Representative shall be solely responsible for all of its own expenses incurred in connection with the performance of its responsibilities under this Agreement

2.6 Representative shall not delegate to any other person Representative's duties under this Agreement without the prior written consent of the Company.

2.7 During the term of this Agreement, Representative is authorized to use the Company's trade name or any of the Company's trademarks relating to the Products, but only for display purposes in connection with Representative's solicitation of orders for Products from customers in the Territory. Representative shall not use the Company's trade name or any of its trademarks as part of Representative's trade or business name or in any other way which the Company considers misleading or objectionable. Without limiting the foregoing, Representative shall not use the Company's name, trademark or logo on any business card, letterhead, marketing materials and the like, except that Representative may use business cards that include Company's logo, provided that any such business card (a) has been approved in writing in advance by the Company, (b) clearly identifies Representative as an independent agent, and (c) does not misrepresent the authority or position of Representative in any way, and provided further that Representative shall immediately cease all use of Company's logo and any such existing business cards upon the earlier to occur of (i) termination or expiration of this Agreement, or (ii) Company's written request thereof, at Company's sole and absolute discretion.

2.8 During the term of this Agreement, and for one (1) year following its termination or expiration, Representative agrees not to manufacture, develop, distribute, sell, promote or solicit orders for any products, goods or services that are competitive with the Products for, to or from <u>any customer within the Territory</u>.

2.9 Representative or its employees, partners and permitted agents shall carry, with respect to the operation of all motor vehicles used in the solicitation of orders for Products, bodily injury liability insurance coverage of at least $250,000 for one person and at least $500,000 for each accident, and property damage liability insurance coverage of at least $100,000. Representative shall advise the Company in writing of the name and address of the insurance carrier(s) and of the policy identification number(s) at any time upon Company's reasonable request.

3. <u>Sales and Collection Procedures</u>.

3.1 Representative shall solicit orders subject to the Standard Terms and Conditions, on such order forms, at such prices and for delivery on such schedule(s) as are established from time to time by the Company upon prior written notice to Representative. The Company's standard price list for the Products currently in effect is attached as <u>Exhibit B</u>.

3.2 Each order shall be signed and dated by the customer placing the order, and shall be promptly forwarded by Representative to the Company on Company's standard

cws



form of purchase order. Representative shall make clear that all orders are subject to the Company's acceptance or rejection.

3.3 All orders submitted shall be subject to acceptance or rejection by the Company. The Company may refuse to accept any order for any reason that Company may deem sufficient. In accordance with each order accepted by the Company, Products shall be shipped by the Company directly to the customer. The Company shall bill the customer for the Products shipped, at the prices and subject to the terms specified in the accepted order.

3.4 Representative shall, at the Company's request, assist the Company in collecting any invoices to customers in the Territory, but all payments shall be made directly to the Company. Any such payments received by the Representative shall be immediately forwarded to the Company, in the same form received and without deduction of any kind. The Company shall have entire control with respect to the extension of credit to customers.

3.5 Company may, at its sole discretion, furnish to Representative demonstration units of any (or all) models of Products, solely for Representative's use to promote the Products and solicit orders therefor from customers within the Territory. Representative agrees to use reasonable precautions to prevent damage to or loss of any such demonstration unit, to maintain any such demonstration unit in good condition and not permit the value thereof to be impaired in any way and to keep any such demonstration unit clean. Any such demonstration unit shall at all times be and remain the exclusive property of Company. Representative agrees to execute and deliver to Company such documents as are reasonably deemed by Company to be necessary or appropriate under any applicable law to establish, provide notice of and perfect Company's ownership of such demonstration unit. Representative shall return any such demonstration unit immediately upon Company's request or immediately upon termination or expiration of this Agreement, whichever event occurs first.

3.6 During each year of the term of this Agreement, Representative may, at Representative's sole option, purchase up to two (2) demonstration units of each model of the Product from the Company at the applicable rates set forth in Company's Demonstration Unit Price Schedule, provided that for a minimum of six (6) months after Representative's receipt of any such demonstration unit, such demonstration unit may be used solely for Representative's promotion of the Products and solicitation of orders therefor from customers within the Territory. A copy of Company's Demonstration Unit Price Schedule currently in effect is attached hereto as Exhibit F. Representative may sell the demonstration unit after said six-month period and keep the entire proceeds from such sale, provided that any such sale shall be to a customer located in the Territory and that use of such demonstration unit must be intended to occur solely within the Territory. Sales of demonstration units must meet all standard requirements applicable to sales of new Products, including, but not limited to, all necessary disclosures. The applicable warranty period with respect to any demonstration unit sold to Representative under this Section 3.6 shall begin upon Representative's receipt of such demonstration unit.

3.7 To secure payment and performance of Representative's obligations under this Agreement, Representative agrees to and hereby does grant Company a security interest in any demonstration unit purchased by Representative under Section 3.6. Representative shall not pledge, hypothecate or grant to any third party any security interest in the demonstration unit and

CWS

 

shall keep the demonstration unit free from all liens, encumbrances and security interests other than Company's interest. Company shall have the right to execute, deliver and file, for filing in all appropriate locations in the United States, any form prepared by Company which is necessary or appropriate to perfect Company's security interest with respect to all or any part of the demonstration unit. Representative shall, upon request, take any action reasonably deemed advisable by Company to preserve the demonstration unit or to establish, determine priority of, perfect, continue perfected, terminate and/or enforce Company's interest in the demonstration unit.

4.    Activities of Representative.

4.1    At Company's sole discretion, Company may from time to time furnish to Representative Product advertising brochures and materials, without charge, for distribution among potential customers within the Territory, in an amount deemed appropriate by the Company in light of the potential sales volume of the Products in the Territory. Representative shall promptly return all such materials upon Company's request. Representative shall not use any advertising or promotional materials to promote the Products that have not been provided by the Company, unless Representative shall have first obtained the prior written approval from the Company of such materials.

4.2    Representative shall not disparage, discredit or malign, whether verbally, in writing, by its conduct or in any other way, the Company or any of its products, goods or services while this Agreement is in effect.

4.3    Representative shall provide the Company with any information known to Representative as to a customer's use or application of Products, any information Representative receives that is reasonably likely to be of interest, use or benefit to the Company in relation to the marketing of its Products (including information regarding competition and any complaints about Products) and such other information as the Company may reasonably request.

4.4    Representative will organize workshops and/or symposia relating to the Products, and will attend and participate in industry-related trade shows, in the Territory from time to time in consultation with the Company.

4.5    Representative will provide the Company with a thirty-day and a ninety-day rolling forecast of anticipated orders for Products, such forecasts to be submitted to Company in writing at the beginning of each period covered by the applicable forecast.

4.6    Representative shall install the Products sold by Company to customers within the Territory to fill orders solicited by Representative and shall provide training to the buyer of such Product, and any operators designated by such buyer, in the use and operation of the Product, such installation and training to be in accordance with Company's methods, specifications, policies and procedures then in effect regarding installation of such Product and training in the use and operation thereof.

4.7    Representative shall strictly comply, and shall ensure that all its employees and permitted agents or subcontractors and their employees strictly comply, with all laws, regulations and orders made by any governmental authorities that are applicable to

 

Representative or its representatives as a result of this Agreement, including, but not limited to, the Medicare/Medicaid Anti-Kickback provisions of the U.S. Social Security Act, 42 U.S.C. 1320a-7b, as amended. Representative represents and certifies that:

(a) there are no pending or threatened investigations or enforcement actions by any governmental or regulatory authorities against Representative or anyone who may represent Representative hereunder in which it is alleged or is under investigation that Representative or such other person or entity has engaged in any fraudulent or unlawful activity;

(b) neither Representative nor anyone who may represent Representative hereunder has been debarred, suspended or excluded, or is subject by proposed debarment, suspension or exclusion, from participation in the Medicare or Medicaid programs or any other government program which provides reimbursement for medical goods or services, nor have been convicted of, or have charges pending regarding, any offenses which may lead to such debarment, suspension or exclusion.

Representative agrees to immediately inform the Company if any of the above representations become inaccurate in any way during the term of this Agreement.

5. Commissions.

5.1 As Representative's sole compensation for its services under this Agreement (not including any bonus commission that may be paid under Section 5.2), the Company will, subject to Sections 5.5 and 5.6 below, pay to Representative a standard commission equal to the applicable rate set forth in the Commission Schedule multiplied by the Net Invoice Price of each order for Products submitted to the Company by the Representative for shipment into the Territory and for which the Company shall have received final payment in full.

5.2 Representative may also earn certain bonus commissions hereunder at the applicable rates set forth in the Commission Schedule. Each bonus commission, if any, shall be paid to Representative within thirty (30) days after the end of each anniversary of the date hereof during the term of this Agreement.

5.3 The Company shall not be liable for any commissions (including bonus and split commissions), profits, damages or other compensation to Representative whatsoever when Products are provided in full or partial satisfaction of any warranty or other contract breach, tort or other product liability claim, or with respect to any order: (a) from any customer of which Representative is, at the time of the order, an agent or employee, (b) which the Company rejects, (c) which may be canceled by the customer for any reason (whether or not within the Company's control), (d) for which full and final payment has not been received, (e) for which all or any portion of the invoice price is refunded by the Company to the customer, (f) for any consumables, replacement parts, spare parts, services and the like (other than the commission, if any, already earned by Representative on the order for Products for which such part or service is ordered by customer) or for any additional cooling cart or additional cart, or (g) from any customer outside the Territory (including customers outside the Territory that are operated by a National Account), and Company shall not be liable for any commissions (including bonus and split



commissions), profits, damages or other compensation to Representative whatsoever for Representative's sale of any demonstration unit purchased by Representative under Section 3.6. In any cases described in this Section 5.3, if a commission has already been paid by the Company, a credit or adjustment will be made on commissions subsequently earned or, at the Company's option, Representative will refund such payment.

5.4    Company shall provide to Representative, on or before the fifteenth (15th) day of each month during the term of this Agreement, a statement showing net commissions (including split commissions, if any) payable to Representative as provided in this Article 5, with respect to collections made during the preceding month by the Company on orders for Products solicited by Representative in the Territory. Commissions reflected as payable in each such statement shall be due upon Representative's receipt of, and shall be remitted by Company with, such statement. Commissions payable under this Agreement shall not be considered earned or accrued until they are due in accordance with this Section 5.4. Company may, in its sole discretion, advance to Representative any anticipated commission.

5.5    In cases in which an order is solicited by a sales representative of Company, other than Representative, from a customer located within the Territory at a symposium or workshop organized by such sales representative and described in Section 2.1 hereof, Company will pay a split commission to such sales representative and Representative at the applicable rates set forth in the Commission Schedule. In the event that Representative solicits an order for Products from any customer outside the Territory at a symposium or workshop organized by Representative in accordance with Section 2.1 hereunder for which Representative would earn a commission under this Article 5 if such customer were located within the Territory, then Company shall pay to Representative a split commission in accordance with the Commission Schedule. In no event shall Company be required to pay more than the amount of one full commission applicable to the underlying order.

5.6    If Representative solicits an order for Products from any customer or prospective customer within the Territory that constitutes any part of a National Account for which Representative has earned a commission under this Article 5, then the commission that Company shall pay to Representative for such order shall be equal to seventy-five percent (75%) of the standard commission that would be payable to Representative in accordance with Paragraph 1 of the Commission Schedule if such customer were not a National Account. Representative acknowledges that Company will pay a commission equal to twenty-five percent (25%) of such standard commission on such order to Company's National Accounts manager.

6.    Warranties and Indemnification.

6.1    All Products shall be covered by Company's standard limited warranty then in effect, as set forth in the Standard Terms and Conditions or incorporated therein by reference (the "Limited Warranty"). Representative is not authorized to extend to the customers any warranty other than the Limited Warranty. A copy of the Limited Warranty now in effect is attached hereto as Exhibit G.

6.2    The Company agrees to indemnify Representative against any liability or obligation to any customer under the Company's warranty set forth in the Standard Terms and

 

Conditions or pursuant to any manufacturing or Product performance representation made, or engineering data furnished, by the Company to Representative or to customers in writing.

6.3 Representative agrees to indemnify the Company against any damage, loss or expense, including, but not limited to, the Company's reasonable attorneys' fees, incurred as a result of (a) Product representations or statements not specifically authorized by the Company herein or otherwise in writing, or (b) Representative's obligations under this Agreement.

7. Term and Termination.

7.1 The term of this Agreement shall commence on the date hereof and shall remain in effect for an initial term expiring on June 30, 2006, unless earlier terminated pursuant hereto. This Agreement may thereafter be renewed for successive one-year periods if both parties agree in writing at least sixty (60) days prior to the expiration of the initial or then-current renewal term to renew the Agreement.

7.2 Company may terminate this Agreement (a) upon written notice to Representative if Representative fails to meet any minimum volume target under Section 2.2, or (b) upon sixty (60) days prior written notice to Representative if any third party entity acquires an equity interest in Company and Company appoints such third party a distributor or sales representative for the Territory or any portion thereof. Either party may terminate this Agreement upon written notice to the other party if the other party has failed to perform or comply with any other material term or condition of this Agreement and has not cured such nonperformance or noncompliance within thirty (30) days after receipt of written notice of such failure from the terminating party. This Agreement may also be terminated by the Company, effective immediately upon notification thereof, in the event that Representative becomes insolvent, makes an assignment for the benefit of its creditors, or becomes the subject of an "order for relief" as that term is defined in the U.S. Bankruptcy Code or of any state insolvency proceedings.

7.3 Following termination or expiration of this Agreement, anything in this Agreement to the contrary notwithstanding, Representative shall be entitled to commissions only with respect to orders accepted by Company prior to the effective date of termination or expiration of this Agreement. No party shall be entitled to any compensation or reimbursement for consequential damages or its inability to recoup any investment made in connection with its performance under this Agreement, loss of prospective profits, anticipated sales or (except as provided in the preceding sentence) anticipated commissions, or other losses occasioned by breach of this Agreement or termination or expiration of this Agreement, whether with or without cause.

7.4 Upon termination or expiration of this Agreement, Representative shall return all records, books, customer, prospect or price lists, drawings, blueprints, instruction sheets, business cards, advertising and promotional materials and all of the Company's supplies of every kind and character, and all other documents relating to the business of the Company which may be in the possession or under the control of Representative. In addition, upon termination or expiration of this Agreement, Representative shall immediately cease any use of

CWS

 

the Company's trademarks and trade names including, but not limited to, any permitted use of Company's logo or trademark on Representative's business card.

8. Miscellaneous.

8.1 All customer, prospect and price lists, plans, drawings, blueprints and specifications and other documents relating to the business of the Company shall be treated by Representative as confidential information and not disclosed to any third party without the Company's prior written consent.

8.2 This Agreement may not be assigned by Representative, in whole or in part, whether voluntarily or by operation of law, without the prior written consent of the Company. Any such attempted assignment without the prior written consent of the Company shall be void and without effect and shall constitute a material breach of the Agreement.

8.3 This Agreement shall inure to the benefit of the parties hereto and shall be binding upon the parties hereto and their respective successors and permitted assigns.

8.4 If a court of competent jurisdiction determines any provisions of this Agreement are illegal, excessively broad or otherwise invalid or unenforceable, this Agreement shall be construed so that the remaining provisions shall not be affected thereby but shall remain in full force and effect, and any such illegal, overbroad, invalid or unenforceable provision or provisions shall be deemed, without further action by any person, to be modified and/or limited to the extent necessary to render the same valid and enforceable.

8.5 This Agreement, including all exhibits to this Agreement, constitutes the entire agreement between the parties with respect to the subject matter hereof. This Agreement supersedes and cancels all prior oral and written agreements, policies, understandings, representations and negotiations between the parties with respect to the subject matter hereof, and there are no conditions affecting this Agreement that are not expressed in this Agreement.

8.6 Except as otherwise provided herein, this Agreement may be amended only by an agreement in writing signed by both parties.

8.7 This Agreement shall be construed, enforced and performed in accordance with the internal laws of the State of Florida, without reference to conflict of laws principles.

8.8 All notices, requests, demands and other communications under this Agreement shall be given in writing and shall be either: (a) personally delivered; (b) sent by facsimile transmission or other electronic means of transmitting written documents; or (c) sent to the parties at their respective addresses indicated in this Agreement, by registered or certified U.S. mail, return receipt requested and postage prepaid, or by private overnight mail courier service. The respective addresses to be used for all notices, requests, demands or other communications are as follows:

CWS

If to the Company:

Orion Lasers, Inc.
6555 North Powerline Road
Suite 303
Fort Lauderdale, Florida 33309
Facsimile: (954) 229-8310
Attention: Mauro Wjuniski

If to Representative:

Anti-Aging Solutions, Inc.
1102 Gleaning Close
Virginia Beach, VA 23455
Attention: Catherine Shelton

8.9 Representative hereby acknowledges receipt of a signed copy of this Agreement.

IN WITNESS THEREOF, the parties executed the foregoing Agreement on the date first written above.

ORION LASERS, INC.
("Company")

By: [signature]
Name: MAURO WJUNISKI
Title: CEO

ANTI-AGING SOLUTIONS, INC
("Representative")

By: [signature] Catherine Shelton
Name: CATHERINE SHELTON
Title: PRESIDENT

CWS

# EXHIBIT A

## Commission Schedule

Subject to the terms and conditions of the Agreement, Representative shall solicit orders for Products only at prices ranging from 90% (ninety percent) to 100% (one hundred percent) of the applicable list price for such Product as set forth on Company's price list then in effect ("List Price"). Representative shall not solicit any orders for Products at prices less than 90% of the then current List Price for such Product. The current price list is set forth in Exhibit B to the Agreement. Commissions to be paid to Representative in accordance with Article 5 of the Agreement shall be paid at the following rates:

1. **Standard Commissions under Section 5.1:**

| Price for Product | Commission Rate |
|---|---|
| On 90% (ninety percent) of the List Price for such Product: | 23% (twenty three percent) |
| On such amount, if any, that exceeds 90% (ninety percent) of the List Price for such Product (but in no event more than 100% of the List Price for such Product): | 50% (fifty percent) |

2. **Bonus Commissions under Section 5.2:**
During the term of the Agreement, on or about each anniversary of the date of the Agreement, Company shall determine the applicable bonus commission, if any, to be paid to Representative under Section 5.2 of the Agreement. Any such bonus commission shall be determined by multiplying the applicable bonus commission rate by the total volume of sales (based on Net Invoice Price) by Company of Products to customers within the Territory for the twelve-month period immediately preceding such anniversary date resulting from orders solicited either (a) by Representative or (b) by any other sales representative of Company at any symposium or workshop outside the Territory described in Section 2.1. The applicable bonus commission rates are as follows:

| Volume of Sales | Applicable Bonus Commission |
|---|---|
| Less than $800,000 | no bonus commission |
| $800,000-$1,200,000 | 1% on total net sales for such 12 month period |
| More than $ 1,200,000 | 1.5% on total net sales for such 12 month period |

3. **Split Commissions under Section 5.5:**
If any sales representative other than Representative solicits an order for Products from any customer within the Territory in accordance with Section 2.1 of the Agreement, then the commission to be paid to Representative shall be an amount equal to Representative's applicable standard commission rate, as described above, less the commission paid to such other sales representative. If Representative solicits an order for Products from any

CW CWS

customer outside of the Territory pursuant to the last two sentences of Section 2.1 of the Agreement, then Representative's commission shall be 3% (three percent).

W: CWS

 

# EXHIBIT B

## Products / Current Price List

1.

| Part # | Item Description | Price |
|---|---|---|
| AAHR15030200 | Sonata Hair Removal System<br>Including:<br>Main Unit<br>Cooling Cart<br>Diode Treatment Head<br>Safety Glasses (2)<br>Safety Warning Sign<br>Power Cord<br>Manual<br>Interlock<br>Keys (2)<br>Shipping<br>Installation<br>Operator's Training | $67,000.00 |
| AAHR28100101 | Additional Cooling Cart | $ 3,000.00 |

Obs.: NO commission on the additional Cooling Cart!!!

One additional year of extended warranty (no heads included) $ 7,000.00

2.

| Part # | Item Description | Price |
|---|---|---|
| AAIPO3030302 | Harmony System<br>Including:<br>Main Unit<br>Cart<br>Safety Glasses (3)<br>Safety Warning Sign<br>Foot Switch<br>Power Cord<br>Manual<br>Interlock<br>Keys (2)<br>Shipping<br>Installation<br>Operator's Training | $39,700.00 |
| AAIP14070301 | Long Pulse Nd: YAG Module | $15,000.00 |
| AAIP14070302 | Q Switched Nd: YAG Module | $20,000.00 |
| AAIP18020301 | HR 650 AFT Module | $5,000.00 |
| AAIP18020302 | SR 570 AFT Module | $5,000.00 |

| | | |
|---|---|---|
| AAIP18020303 | VL/PL 540 AFT Module | $5,000.00 |
| AAIP18020304 | Acne 420 AFT Module | $5,000.00 |
| AAIP18020305 | UVB Module | $15,000.00 |
| AAIP02100301 | Additional Cart | $1,500.00 |

Obs.: NO commission on Additional Cart

One additional year of extended warranty (no Heads included) $ 6,000.00

3.

| Part # | Item Description | Price |
|---|---|---|
| | Zimmer Cryo 5 Air Cooling Unit including:<br>Shipping<br>Installation<br>Operator's Training | $9,900.00 |

 

# EXHIBIT C

## Standard Terms and Conditions of Sale

1. **Offer; Cancellation.** This writing constitutes an offer or counter-offer by Orion Lasers, Inc. ("Seller") to sell the products described on Seller's quotation or purchase order attached hereto in accordance with these terms and conditions. This writing is not an acceptance of any offer made by buyer, and acceptance is expressly conditioned upon assent to these terms and conditions. Seller objects to any additional or different terms contained in any purchase order or other communication previously or hereafter provided by buyer to Seller. No additional or different terms or conditions will be binding upon Seller unless specifically agreed to in writing. No order may be cancelled or altered by buyer except upon terms and conditions acceptable to Seller, as evidenced by Seller's written consent.

2. **Prices and Payment.** All prices are subject to change upon notice. Payment is due within 7 days after buyer's receipt of Seller's invoice, unless Seller requires payment in advance. Interest will be charged at the rate of 18% per year or the highest rate permitted by applicable law, whichever is less, on accounts more than 30 days past due.

3. **Taxes and Other Charges.** Any manufacturer's tax, occupation tax, use tax, sales tax, excise tax, value added tax, duty, custom, inspection or testing fee, or any other tax, fee, interest or charge of any nature whatsoever imposed by any governmental authority on or measured by the transaction between Seller and buyer (collectively, "taxes and other charges") shall be paid by buyer in addition to the prices quoted or invoiced. In the event Seller is required to pay any such taxes and other charges, buyer shall reimburse Seller therefor.

4. **Delivery, Claims and Force Majeure.** Delivery of products to a carrier at Seller's facility or other loading point shall constitute delivery to buyer; and regardless of shipping terms or freight payment, buyer shall bear all risk of loss or damage in transit. Seller reserves the right to make delivery in installments, unless otherwise expressly stipulated herein; all such installments are to be separately invoiced and paid for when due per invoice, without regard to subsequent deliveries. Delay in delivery of any installment shall not relieve buyer of its obligations to accept remaining deliveries.
Buyer shall inspect each product promptly upon receipt. Claims for errors in delivery must be made in writing to Seller within 10 days after buyer's receipt of shipment. Failure to give such notice shall constitute unqualified acceptance and a waiver of all such claims by buyer. Claims for loss or damage to goods in transit should be made to the carrier and not to Seller.
All delivery dates are approximate. Seller shall not be liable for any damages as a result of any delay or failure to deliver due to any cause beyond Seller's reasonable control, including, without limitation, any act of God, act of buyer, embargo or other governmental act, regulation or request, fire, accident, strike, slowdown, war, act of terrorism, riot, delay in transportation, or inability to obtain necessary labor, materials or manufacturing facilities. In the event of any such delay the date of delivery shall be extended for a period equal to the time lost because of the delay. Buyer's exclusive remedy for other delays and for Seller's inability to deliver for any reason shall be rescission of this agreement.

5. **Changes.** Seller may at any time make such changes in design and construction of products as Seller deems appropriate. If the design of any product purchased hereunder is materially changed prior to shipment, Seller shall notify buyer of such change as soon as reasonably practicable after such change. In the event of any such change, buyer may accept the product with such change, or buyer may cancel this agreement with respect to the changed product only.

6. **Warranties.** Seller warrants its products in accordance with its express limited warranty, which is attached hereto. **SUCH WARRANTY IS EXCLUSIVE AND IN LIEU OF ALL OTHER REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED; AND SELLER EXPRESSLY DISCLAIMS AND EXCLUDES ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR PURPOSE.**
Any description of the products, whether in writing or made orally by Seller or Seller's agents, specifications, samples, models, bulletins, drawings, diagrams, engineering sheets or similar materials used in connection with buyer's order are for the sole purpose of identifying the products and shall not be construed as an express warranty. Any suggestions by Seller or Seller's agents regarding use, application or suitability of the products shall not be construed as an express warranty unless confirmed to be such in writing by Seller.
Use of the products requires the exercise of sound medical judgment, and clinical results may vary based on operator skill and experience, individual patient suitability, individual patient response to treatment and other factors.

7. **Installation.** Installation of the products at buyer's facility will be completed by Seller directly or by Seller's designated representative. Subject to the terms and conditions hereof, Seller will provide to buyer Seller's standard training in the use and operation of the products.

8. **Consequential Damages and Other Liability; Indemnity.** Except as otherwise agreed in writing, Seller's liability with respect to the products sold hereunder shall be limited to the warranty referenced in section 6 hereof and, with respect to other performance of any contract with buyer, shall be limited to the contract price. **SELLER SHALL NOT BE SUBJECT TO ANY OTHER OBLIGATIONS OR LIABILITIES, WHETHER ARISING OUT OF BREACH OF CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY) OR OTHER THEORIES OF LAW, WITH RESPECT TO PRODUCTS SOLD OR SERVICES RENDERED BY SELLER, OR ANY UNDERTAKINGS, ACTS OR OMISSIONS RELATING THERETO.** Without limiting the generality of the foregoing, Seller specifically disclaims any liability for property damages, special or punitive damages, damages for lost profits or revenues, cost of substitute products, or for any other types of economic loss, or for claims of buyer's customers or any third party for any such damages. **SELLER SHALL NOT BE LIABLE FOR AND DISCLAIMS ALL CONSEQUENTIAL, INCIDENTAL AND CONTINGENT DAMAGES WHATSOEVER.**
Buyer shall indemnify Seller against any and all losses, liabilities, damages and expenses (including, without limitation, attorneys' fees and other costs of defending any action) that Seller may incur as a result of any claim by buyer or others arising out of or in connection with the products and/or services sold hereunder and based on product or service defects not proven to have been caused solely by Seller's negligence.

9. **Technical Information.** Any sketches, models or samples submitted by Seller shall remain the property of Seller and shall be treated as confidential information unless Seller has in writing indicated a contrary intent. No use or disclosure of such sketches, models and samples, or any design or production techniques revealed thereby, shall be made without the express written consent of Seller. The purchase and sale of products hereunder shall in no way be deemed to confer upon buyer any right or interest in or license to any patent, patent application, design, copyright, trademark, service mark or trade name or any other proprietary or intellectual property right of Seller relating to any product sold hereunder.

 

10.  **Manuals, Brochures, Instructions.**  Any and all operating manuals, instructions, brochures, warnings and the like concerning the products supplied hereunder are supplied as an aid to Buyer and are not represented to be accurate, complete or sufficient for every use or purpose or for treatment of every patient in Buyer's clinical setting.  Buyer warrants that it will train all of its employees and/or third party users of the products purchased by buyer hereunder so that such employees and/or third parties will use the products properly and safely.  Buyer will indemnify and hold harmless Seller against all liabilities and expenses (including attorneys' fees) arising out of the use of the products by buyer or by a third party.  Buyer acknowledges that improper use of the products carries a risk of injury to patients.

11.  **Education; Compliance with Laws.**  Buyer is solely responsible for the use and operation of the products in accordance with all applicable laws and regulations and for confirmation of all user qualifications.  Buyer acknowledges improper use of the products carries a risk of injury to patients.

12. **Governing Provisions.** THESE TERMS AND CONDITIONS SHALL CONSTITUTE THE ENTIRE AGREEMENT BETWEEN SELLER AND BUYER, AND SHALL BE GOVERNED BY AND SHALL BE CONSTRUED ACCORDING TO THE LAWS OF FLORIDA (WITHOUT REFERENCE TO PRINCIPLES OF CONFLICTS OF LAWS).  THERE ARE NO CONDITIONS AFFECTING THIS AGREEMENT WHICH ARE NOT EXPRESSED HEREIN.

**EXHIBIT D**

**Territory**
**Virginia and West Virginia states, and Washington D.C.**

 

# EXHIBIT E

**Minimum Volume**

The following shall be the minimum volume for Product orders with respect to each month during the first year of the Agreement, beginning on the date of the Agreement:

| MONTH: | MINIMUM NUMBER OF UNITS: |
|---|---|
| 1 | 0 |
| 2 | 1 |
| 3 | 1 |
| 4 | 1 |
| 5 | 1 |
| 6 | 1 |
| 7 | 1 |
| 8 | 1 |
| 9 | 1 |
| 10 | 1 |
| 11 | 1 |
| 12 | 2 |

 

# EXHIBIT F

**Demonstration Unit Price Schedule**

1.

| Part # | Item Description | Price |
|---|---|---|
| AAHR15030200 | Sonata Hair Removal System | $33,000.00 |
| | Including: | |
| | Main Unit | |
| | Cooling Cart | |
| | Diode Treatment Head | |
| | Safety Glasses (2) | |
| | Safety Warning Sign | |
| | Power Cord | |
| | Manual | |
| | Interlock | |
| | Keys (2) | |
| AAHR28100101 | Additional Cooling Cart | $ 3,000.00 |

2.

| Part # | Item Description | Price |
|---|---|---|
| AAIPO3030302 | Harmony System | $20,000.00 |
| | Including: | |
| | Main Unit | |
| | Cart | |
| | Safety Glasses (3) | |
| | Safety Warning Sign | |
| | Foot Switch | |
| | Power Cord | |
| | Manual | |
| | Interlock | |
| | Keys (2) | |
| AAIP14070301 | Long Pulse Nd: YAG Module | 7,300.00 |
| AAIP14070302 | Q Switched Nd: YAG Module | 9,700.00 |
| AAIP18020301 | HR 650 AFT Module | 2,400.00 |
| AAIP18020302 | SR 570 AFT Module | 2,400.00 |
| AAIP18020303 | VL/PL 540 AFT Module | 2,400.00 |
| AAIP18020304 | Acne 420 AFT Module | 2,400.00 |
| AAIP18020305 | UV Module | 7,300.00 |
| AAIP02100301 | Additional Cart | 1,500.00 |

$ 46,600

Obs.: NO commission on Demo Units!!!
NO shipping, installation and operator's training included!!!

CWS

 

# EXHIBIT G

## Company's Limited Warranty

Orion Lasers, Inc. ("Orion") warrants to the original buyer that the buyer's entire Orion Lasers equipment, other than (a) consumable components or accessories, and (b) disposable components or accessories, is free from defects in materials and workmanship, for a period of twelve (12) months from the date of installation, but in no event more than thirteen (13) months from the date of shipment. During the warranty period, Orion shall either repair or replace, at Orion's sole option, any parts of the warranted product, other than treatment heads, determined by Orion to be defective. Such repair or replacement shall be Orion's sole obligation and buyer's sole remedy hereunder and shall be conditioned upon Orion receiving written notice of such defect within ten (10) days after its discovery and, at Orion's option, either return of such parts to Orion at Orion's facility in Fort Lauderdale, Florida, or repair hereunder in accordance with "Depot Service," as defined below.

**THIS WRITTEN WARRANTY IS EXCLUSIVE AND IN LIEU OF ALL OTHER REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, WRITTEN OR ORAL; ORION DISCLAIMS AND EXCLUDES ANY IMPLIED WARRANTY, INCLUDING WITHOUT LIMITATION WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.**

No warranty shall arise from any description of the warranted product or its effectiveness or ability to achieve any particular result(s), whether written or oral, specifications, samples, bulletins, marketing or promotional materials or similar statements made or furnished to buyer. Orion makes no warranty or representation of revenue or profits which may be derived from buyer's use of the warranted product and no such representation or warranty shall arise from projections, studies or other statements or materials given to buyer prior to or at the time of purchase.

Orion warrants to the original buyer that the AFT treatment heads of buyer's Orion Lasers Harmony equipment are warranted for 30,000 pulses; the Q-Switched Nd:Yag head of buyer's Orion Lasers Harmony equipment is warranted for 1 year; the UV treatment head of buyer's Orion Lasers Harmony equipment is warranted for 10,000 pulses; and the Long Pulse Nd:Yag treatment head of buyer's Orion Lasers Harmony equipment is warranted for 60,000 pulses or 1 year, whichever occurs first. If such treatment head is determined by Orion not to conform to this limited warranty, then, with respect to any unused pulses or time, determined by subtracting the number of pulses or time actually used from the applicable number of warranted pulses or time (the "Unused Pulses or Time"), Orion's exclusive obligation and the buyer's sole remedy shall be a credit toward the purchase of a replacement treatment head, such credit equal to a portion of the replacement cost determined by multiplying the full replacement cost by the Unused Pulses or Time divided by the applicable number of warranted pulses or time.

Orion warrants to the original buyer that the diode treatment head of buyer's Orion Lasers Sonata equipment is warranted for a full 1 year.

The above limited warranties set forth in the first and fourth paragraphs of this Limited Warranty shall be void and of no effect: (a) if the warranted product is not installed by an authorized Orion representative, when such installation is required by Orion; (b) if anyone other than an authorized Orion representative removes a product casing or attempts to make any modifications or repairs to the warranted product or makes any attachments or additions to the warranted product; (c) if the warranted product is not operated with the type and level of power required by Orion or the warranted product is not otherwise operated in accordance with Orion's instructions; (d) if the warranted product has not been properly maintained or has been subjected to misuse, negligence or abnormal conditions; or (e) if a warranted product is moved from the site of its original installation by anyone other than authorized Orion personnel without the prior express written consent of Orion. The Limited Warranty shall be void if the warranted product is resold or leased to any party other than the original buyer.

Except as otherwise agreed in writing, Orion's liability with respect to the warranted product shall be limited to the warranty provided hereof, and shall be limited to the price of the warranted product. **ORION SHALL NOT BE**

 

**SUBJECT TO ANY OTHER OBLIGATIONS OR LIABILITIES, WHETHER ARISING OUT OF BREACH OF CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY) OR OTHER THEORIES OF LAW, WITH RESPECT TO PRODUCTS SOLD OR SERVICES RENDERED BY ORION, OR ANY UNDERTAKINGS, ACTS OR OMISSIONS RELATING THERETO.** Without limiting the generality of the foregoing, Orion specifically disclaims any liability for property or personal injury damages, penalties, special or punitive damages, damages for lost profits or revenues, loss of use of the warranted product or any associated equipment, cost of capital, cost of substitute products, facilities or services, down-time, shut-down, slow-down costs or any other types of economic loss, or for claims of buyer's customers or any third party for any such damages. **ORION DISCLAIMS AND SHALL NOT BE LIABLE FOR ANY CONSEQUENTIAL, INCIDENTAL OR CONTINGENT DAMAGES WHATSOEVER. BUYER SHALL INDEMNIFY ORION AGAINST ANY AND ALL LOSSES, LIABILITIES, DAMAGES AND EXPENSES (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND OTHER COSTS OF DEFENDING ANY ACTION) WHICH ORION MAY INCUR AS A RESULT OF ANY CLAIM BY BUYER OR OTHERS ARISING OUT OF OR IN CONNECTION WITH BUYER'S PURCHASE OR USE OF THE WARRANTED PRODUCT (INCLUDING, WITHOUT LIMITATION, ANY CLAIM ARISING FROM MISUSE OR IMPROPER USE OF THE WARRANTED PRODUCT, WHETHER BY BUYER OR ANY OTHER PERSON, WHETHER OR NOT AUTHORIZED BY BUYER, AND ANY CLAIM ARISING FROM ANY MODIFICATION TO OR ALTERATION OF THE WARRANTED PRODUCT, NOT AUTHORIZED BY ORION), EXCEPT FOR CLAIMS BASED ON BREACH OF THIS LIMITED WARRANTY.**

For the purposes of this Limited Warranty, "Depot Service" shall refer to the following procedure (all the shipment costs will be paid by buyer): (1) Upon receipt of a written notice of a defect in the warranted product, and, if the defect cannot be fixed by telephone instructions, then Orion will, within 24 hours (excluding Saturdays, Sundays and Holidays) of such notice, ship a replacement unit to buyer; (2) Upon receipt of such replacement unit, buyer shall immediately ship to Orion its defective unit; (3) Orion's Service Department will, to the extent reasonably practicable, repair the buyer's defective unit and ship it back to buyer; (4) Buyer shall immediately ship back to Orion Orion's replacement unit.

CWS

# COMMONWEALTH OF VIRGINIA

VIRGINIA BEACH CIRCUIT COURT - CIVIL
JUDICIAL CENTER
VIRGINIA BEACH, VIRGINIA 23456
(757) 385-4186

CASE NO. 810CL08001247-00

TO: ALMA LASERS INC
FORMERLY KNOWN AS ORION LASERS
INC; SERVE:
CT CORPORATION SYSTEM, R/A
4701 COX ROAD, SUITE 301
GLEN ALLEN, VA 23060

SUMMONS

THE PARTY UPON WHOM THIS SUMMONS AND THE ATTACHED COMPLAINT ARE SERVED IS HEREBY NOTIFIED THAT UNLESS WITHIN 21 DAYS AFTER SUCH SERVICE, RESPONSE IS MADE BY FILING IN THE CLERK'S OFFICE OF THIS COURT A PLEADING IN WRITING, IN PROPER LEGAL FORM, THE ALLEGATIONS AND CHARGES MAY BE TAKEN AS ADMITTED AND THE COURT MAY ENTER AN ORDER, JUDGMENT OR DECREE AGAINST SUCH PARTY EITHER BY DEFAULT OR AFTER HEARING EVIDENCE.

APPEARANCE IN PERSON IS NOT REQUIRED BY THIS SUMMONS.

DONE IN THE NAME OF THE COMMONWEALTH OF VIRGINIA ON MARCH 05, 2008.

CLERK: TINA ESGUERRA SINNEN

TINA E. SINNEN

BY: ______________________
CLERK/DEPUTY CLERK

ATTORNEY: DAVID M ZOBEL

**CT CORPORATION**
A WoltersKluwer Company

**Service of Process Transmittal**
03/20/2008
CT Log Number 513217912

**TO:** Sophia Barshak
Alma Lasers, Inc.
485 Half Day Road, Suite 100
Buffalo Grove, IL 60089

**RE:** **Process Served in Virginia**

**FOR:** Alma Lasers, Inc. (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Anti-Aging Solutions, Inc., Pltf. vs. Alma Lasers, Inc, Dft.<br>*Name discrepancy noted.* |
| **DOCUMENT(S) SERVED:** | Summons, Complaint, Exhibit |
| **COURT/AGENCY:** | Virginia Beach City Circuit Court, VA<br>Case # 810CL08001247-00 |
| **NATURE OF ACTION:** | Monies Due and Owing - Seeking $128,558.18 |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Glen Allen, VA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 03/19/2008 at 09:10 |
| **APPEARANCE OR ANSWER DUE:** | Within 21 days |
| **ATTORNEY(S) / SENDER(S):** | David M. Zobel<br>HUff Poole & Mahoney P.C.<br>4705 Columbus Street<br>Virginia Beach, VA 23462<br>757-499-1841 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via Fed Ex Standard Overnight , 790985917411 |
| **SIGNED:** | C T Corporation System |
| **PER:** | Emmett Hickam |
| **ADDRESS:** | 4701 Cox Road<br>Suite 301<br>Glen Allen, VA 23060 |
| **TELEPHONE:** | 804-217-7255 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.