IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

NORFOLK DIVISION

ANTI-AGING SOLUTIONS, INC.

    Plaintiff,

v.                                              Civil Action No.  2:08 cv 167

ALMA LASERS, INC., formerly known
as ORION LASERS, INC.

    Defendant.

## **AMENDED COMPLAINT**

The Plaintiff, Anti-Aging Solutions, Inc. ("Anti-Aging"), by counsel, files its Amended Complaint against the Defendant, Alma Lasers, Inc. ("Alma Lasers"), formerly known as Orion Lasers, Inc., and seeks a judgment against Alma Lasers in the amount and on the grounds as set forth below:

1.    Anti-Aging is incorporated under the laws of the Commonwealth of Virginia and has a principal place of business in Norfolk, Virginia.

2.    Alma Lasers is incorporated under the laws of the State of Delaware and has a principal place of business in Buffalo Grove, Illinois.  Alma Lasers is registered with Virginia's State Corporation Commission as a foreign corporation licensed to transact business within the Commonwealth of Virginia.  Alma Lasers has a registered agent in Virginia, which is CT Corporation, 4701 Cox Road, Suite 301, Glen Allen, VA  23060.  At all times relevant to the allegations contained in this Complaint, Alma Lasers sold products within the Commonwealth of Virginia and thus transacted business within this Commonwealth.  Therefore, this Court can

exercise personal jurisdiction over Alma Lasers pursuant to Virginia Code Ann. § 8.01-328.1(A) (1) & (2).

3. Alma Lasers' corporate name was formerly Orion Lasers, Inc. By Certificate of Amendment that was filed with the Secretary of State of the State of Delaware on October 20, 2005, Orion Lasers, Inc. amended its Certificate of Incorporation to change its name from Orion Lasers, Inc. to Alma Lasers, Inc.

4. For the purposes of the allegations contained in this Complaint, Orion Lasers, Inc. and Alma Lasers, Inc. are the same corporation.

5. By contract dated July 1, 2004, Anti-Aging entered into a Sales Representative Agreement ("the Agreement") with Orion Lasers, Inc. A copy of the Agreement is attached to this Complaint as **Exhibit A** and is made a part of this pleading. Pursuant to Paragraph 2.1 of the Agreement, Orion Lasers, Inc. appointed Anti-Aging as its exclusive sales representative for the company's products in the "Territory", as defined in Exhibit D to the Agreement. Anti-Aging's Territory consisted of Virginia, West Virginia, and the District of Columbia. Paragraph 3.1 of the Agreement stated that Anti-Aging was to solicit orders for the sale of company products at such prices as contained in the standard price list that was attached to the Agreement as Exhibit B. Paragraph 5.1 of the Agreement stated that Anti-Aging's sole compensation for its services under the Agreement was the payment of a standard commission as set forth in the Commission Schedule attached to the Agreement, which was Exhibit A to the Agreement. The Commission Schedule referred to the Price List, Exhibit B attached to the Agreement, and provided that the Sales Representative could offer any purchaser a discount on the sales price up to a maximum of ten per cent off the price shown on the Price List. The Commission Schedule provided that for each sale made, the Sales Representative would be paid a commission equal to 23% on 90% of the List Price for each product. If the sales price exceeded 90% of the List Price,

then Orion Lasers would pay the Sales Representative 50% of the amount that exceeded 90% of the List Price. Paragraph 5.6 of the Agreement carved out an exception to the standard commissions to be paid to Anti-Aging if it sold products to a customer that was already part of a "National Account" with Orion Lasers. Paragraph 5.6 provided that if Anti-Aging sold any of the company's products to a customer within its Territory, and such customer was a National Account, then Anti-Aging would receive 75% of the standard commission. The remaining 25% of the standard commission would be paid to the National Accounts Manager. Paragraph 7.1 of the Agreement provided that the term of the Agreement was the date of the Agreement through June 30, 2006, unless terminated earlier pursuant to the provisions of Section 7 of the Agreement. Paragraph 7.2 of the Agreement provided that Orion Lasers, Inc. could terminate the Agreement upon written notice to Anti-Aging if Anti-Aging failed to meet any of the minimum volume targets established under Paragraph 2.2 of the Agreement. Paragraph 2.2 of the Agreement provided the following:

> During each month, quarter and year of the term of this Agreement, Representative shall maintain such minimum volume for Product orders from customers in the Territory as established by mutual agreement of the parties pursuant hereto. The minimum volumes with respect to each month and quarter of the initial year of this Agreement, and for the initial year hereof, are set forth in <u>Exhibit E</u> hereto. Prior to each anniversary of the date hereof during the term of this Agreement, Company and Representative shall meet to discuss and mutually agree upon the minimum volumes for the following year, including each month and quarter of such year. If the parties are unable to reach an agreement within thirty (30) days after commencement of such meeting, then either party may terminate the Agreement upon written notice to the other party.

Either party could also terminate the Agreement upon written notice to the other if the other party had failed to comply with any material term of the Agreement, and such failure had not been cured after 30 days written notice from the terminating party.

   6.  In the months preceding the execution the Agreement on July 1, 2004, Orion Lasers was aware that Anti-Aging had strong connections to Sona MedSpas, a personal aesthetic

health care franchise that had ambitious goals for growth. Before the execution of the Agreement, Cathie Hilton – the sole shareholder, director, officer, and employee of Anti-Aging - invited a representative of Sona MedSpas to a workshop in Scottsdale, Arizona for a demonstration of Orion Lasers' products. In addition, Hilton flew, at the expense of her company, that same representative to a meeting at Orion Lasers' corporate office in Fort Lauderdale, Florida, to further evaluate Orion's products and to have a private demonstration by Yariv Matzliach (then Vice President of Sales for Orion Lasers). From that point forward, Ms. Hilton cultivated the relationship with Sona, ultimately culminating in Jim Amos (former CEO) and Heather Rose (former President) of Sona meeting Yariv Matzliach and Mauro Wjuniski of Orion Lasers in Florida in September 2004 to negotiate a national deal for the purchase of Orion Lasers products on a discounted basis. However, Orion Lasers' officers did not invite Ms. Hilton to attend the negotiation session. Ms. Hilton had no involvement in negotiating the prices at which Orion Lasers would sell it products to Sona MedSpas. Moreover, after the deal between Orion Lasers and Sona MedSpas was consummated, Yariv Matzliach told Ms. Hilton that he could not reveal to Ms. Hilton, or to any other Orion Lasers sales representatives, the prices at which Orion Lasers would sell its products to Sona MedSpas. Mr. Matzliach told Hilton that Sona MedSpas requested that the sales prices of such products remain confidential, so that Sona MedSpas' franchisees did not learn the information. Ms. Hilton later learned that this explanation was not true. Sona MedSpas did not request that the prices it was paying for such products from Orion Lasers remain confidential. Instead, it is Ms. Hilton's belief that Orion Lasers did not reveal the sales prices of such products so that it could pay a commission to its sales representatives that was *less than* the commission formula outlined in the Sales Representative Agreement, without telling Orion's sales representatives that it was changing the commission formula.

4

7. From the start of Anti-Aging's Sales Representative Agreement with Orion Lasers, Anti-Aging and Orion Lasers worked together to make Sona MedSpas a National Account. In November 2004, Ms. Hilton's efforts to establish a sales relationship with Sona MedSpas bore fruit. Sona MedSpas began purchasing Orion Lasers products, and those purchases continued into 2005 and 2006. As Sona MedSpas began purchasing Orion Lasers products, Orion Lasers and Anti-Aging worked the Sona MedSpas account under the mutual understanding that Sona MedSpas was a National Account and Anti-Aging was the National Accounts Manager for Sona MedSpas.

8. As Sona MedSpas purchased Orion Lasers products, Orion did, in fact, send commission checks to Anti-Aging. However, Anti-Aging could never confirm the accuracy of the commissions paid because it simply received checks from Orion Lasers, with a check stub indicating the dollar amount of the commission paid, without showing the sales price of each product and without showing the mathematical calculation of how Orion Lasers arrived at the dollar amount of the sales commission.

9. In fact, Anti-Aging did not receive the correct amount of the commission that was due it, pursuant to Exhibit B in the Agreement, on the sale of each product to Sona MedSpas. Because Anti-Aging was the National Accounts Manager for the Sona MedSpas account, Anti-Aging should have received 25% of a 23% commission, based on the sales price of each product, on sales of all Orion products that occurred outside of Anti-Aging's Territory. If the sale occurred inside its Territory, then Anti-Aging should have received the full 23% commission. Instead, Anti-Aging later determined that it was receiving only 25% of a 15% commission on out-of-Territory sales of each Orion Lasers product to Sona MedSpas. On its in-Territory sales, Anti-Aging received only a 15% commission, instead of the standard 23% commission due under the terms of the Agreement.

5

10. As of June 30, 2005, Sona MedSpas had purchased products from Alma Lasers at an aggregate price of $2,652,700.00.

11. By e-mail dated June 24, 2005, Mauro Wjuniski, Vice President of Alma Lasers, sent an e-mail to Anti-Aging Solutions, sending an Addendum to the Sales Representative Agreement. A copy of the Addendum is attached to this Amended Complaint as **Exhibit B** and is made a part of this pleading. Mr. Wjuniski requested that Anti-Aging Solutions sign the Addendum. Prior to sending this e-mail, Mr. Wjuniski gave no indication to Anti-Aging that the Addendum was forthcoming. Therefore, the Addendum was Alma Lasers' arbitrary, unilateral attempt to change the provisions of the Sales Representative Agreement with no prior input from Anti-Aging. The Addendum sought to change Paragraph 2.2 of the Sales Representative Agreement, by providing that sales of Alma Lasers' Products to National Account customers would not be included in the calculation of the "minimum volume of Product orders". The Addendum also sought to change the commission rates applicable to sales to National Account customers. The Addendum sought to give Alma Lasers sole discretion to pay any commission it deemed advisable on sales of products to such account customers. The Addendum also sought to substitute a new Exhibit A to the original Sales Representative Agreement. The primary effect of the new Exhibit A was to exclude sales to a National Account customer for the purposes of determining whether the representative was eligible for a bonus commission under Section 5.2 of the Agreement. In essence, the Addendum was Alma Lasers' attempt to drastically reduce the compensation it was paying to Anti-Aging because it had landed a lucrative National Account for Orion Lasers. Anti-Aging refused to sign the Addendum.

12. After the expiration of the first year of the term of the Sales Representative Agreement between Anti-Aging and Alma Lasers, the parties did not establish a "minimum volume for Product sales: as required in Paragraph 2.2 of the Sales Representative Agreement.

6

July, August, and September passed without the parties mutually agreeing to the minimum sales volume. However, in a telephone conversation that occurred on October 11, 2008, Yariv Matzliach asked Cathie Hilton for her forecast of sales through the end of the quarter. During the phone conversation, the parties never discussed whether they were establishing the "minimum volume for Product orders" as defined in Paragraph 2.2 of the Sales Representative Agreement. During the conversation, Ms. Hilton indicated that she could sell between 4 and 8 systems. Matzliach replied, "Ok, let's make it 6." Soon after the phone call ended, Matzliach sent Hilton an e-mail, stating the following:

> Cathie, in continuation to our today's conversation we have agreed that your sales target for October, November and December 2005 is 6 systems. Alma Lasers, Inc. will support you to meet this target by all means. You have to meet that target in order to keep the Alma Lasers line for next year.
> Best regards,
> Yariv Matzliach

In this e-mail communication, Matzliach attempted to establish "6 systems" as the minimum volume for purposes of Paragraph 2.2 of the Sales Representative Agreement, even though in the telephone conversation, Hilton and Matzliach never mentioned the term "minimum volume for sales Products". In response to Matzliach's e-mail of October 11, 2005, Ms. Hilton responded with an e-mail that same day, sent to Matzliach, in which she stated the following:

> Yariv,
> It was not discussed that I had to sell 6 machines by year end to keep the line next year. You asked me how many systems I thought I could sell by the end of the year and I said "6". That was for projections . . . nothing more.
>
> What is the meaning of this?
>
> Cathie

Matzliach did not respond to this e-mail, and the parties never again discussed a "minimum volume for sales Products" in the context of the requirements of Paragraph 2.2 of the Sales Representative Agreement. Therefore, the parties – in the language of Paragraph 2.2 of the Sales

7

Representative Agreement – did not "mutually agree" to a "minimum volume for Product orders".

13. In January 2006, after Orion Lasers changed its corporate name to Alma Lasers, Inc., Alma terminated Anti-Aging on the pretext that Anti-Aging had failed to maintain the minimum volumes that were established for the fourth quarter of calendar year 2005. Alma Lasers gave Anti-Aging notice of the termination of the Sales Representative Agreement by letter from Mauro Wjuniski to Cathie Hilton, dated January 24, 2006 via facsimile. A copy of this letter is attached to this Amended Complaint as **Exhibit C**.

14. After Alma Lasers fired Anti-Aging as a Sales Representative, Anti-Aging demanded that Alma Lasers provide it with a full accounting of Sona's purchases of Alma (formerly Orion) Lasers products. Prior to the filing of Anti-Aging's original Complaint in this cause of action, Alma Lasers did not provide such an accounting.

15. Anti-Aging's sales efforts resulted in sales of Orion Lasers products to Sona MedSpas in 2004 and 2005 totaling over four million dollars. Anti-Aging should have received commissions totaling an estimated $405,481.42, and that figure may increase as Anti-Aging continues to receive accounting records from Alma Lasers in this litigation. Instead, Anti-Aging received payments totaling $184,922.10 in commission checks. After Alma Lasers fired Anti-Aging, Anti-Aging – in an e-mail to Alma Lasers dated January 26, 2006 - demanded that Alma Lasers pay its sales representatives according to the standard commission outlined in the Sales Representative Agreements within 15 days from the receipt of the e-mail. Alma Lasers did not do so.

16. In addition, Anti-Aging demanded payment on four specific product sales to Sona MedSpas and one product sale to a non-Sona customer within Anti-Agin's territory for which Anti-Aging had received no commission. Alma Lasers later sent Anti-Aging a check for what it

8

claimed were the commissions due and owing on those sales in the amount of $21,298.10, by letter dated March 1, 2006. Typewritten on the check were the words, "Full and final settlement." Anti-Aging refused to accept the check, as the amount of the check was not the correct amount, and if Anti-Aging were to accept the check, it would not be a "full and final settlement" of the commissions Anti-Aging claimed from Alma Lasers. Anti-Aging notified Alma Lasers that it was rejecting the check, and once again demanded an accounting from Alma Lasers. Again, Anti-Aging received no response from Alma Lasers on the issue of the accounting.

17. After months of negotiations between the parties, Alma Lasers eventually sent a wire transfer of $21,298.10 on January 10, 2007 to Anti-Aging's bank account, along with an accompanying e-mail from Miriam Freyer, Director of Finance and Administration for Alma Lasers, a copy of which is attached to this Complaint as **Exhibit D** and is made a part of this pleading. The e-mail confirmed that the wire was sent as payment for disputed commissions without any condition of acceptance that it was a full and final payment of the commissions in dispute. Anti-Aging has also credited the sum of $13,619.83 against the balance due in commissions. This amount represents the figure that Anti-Aging owed to Alma Lasers for the purchase of its demo unit. Finally, Anti-Aging has added to the balance due the sum of $1,800 that was erroneously deducted from one of its commission checks, with the explanation that it was reimbursement for "training expenses". The Sales Representative Agreement mentions nothing about Anti-Aging being liable for training expenses. Thus, the principal amount of Anti-Aging's claim against Alma Lasers currently stands at $185,640.94, and may increase, as Anti-Aging continues to receive accounting records from Alma Lasers in this litigation.

## COUNT I
## BREACH OF CONTRACT – FAILURE TO PAY COMMISSIONS BASED ON THE PROPER PERCENTAGE COMMISSION

18.     The allegations contained in Paragraphs 1 through 17 are incorporated into this Count I and are made a part of this Count.

19.     Alma Lasers failed to pay commissions to Anti-Aging based on the commission formula contained in the Sales Representative Agreement. Alma Lasers did not pay Anti-Aging a commission based on 23% of the sales price for products within its Territory, and 25% of a 23% commission on products outside of its Territory. Instead, Alma Lasers breached the Sales Representative Agreement by paying Anti-Aging a commission based on 15% of the sales price on products within its Territory, and 25% of a 15% commission on products sold outside of its Territory. Moreover, Alma Lasers paid this reduced commission to Anti-Aging, without notifying Anti-Aging that it was even reducing its sales commission or altering the commission formula as contained in the Sales Representative Agreement.

## COUNT II
## VIOLATION OF FLA. STAT. § 686.201

20.     The allegations contained in Paragraphs 1 through 19 above are incorporated into this Count II and are made a part of this Count.

21.     Pursuant to Paragraph 8.7 of the Sales Representative Agreement, the parties agreed that the agreement "shall be construed, enforced and performed in accordance with the internal laws of the State of Florida, without reference to conflicts of laws principles." The State of Florida has a comprehensive statutory section – Chapter 686 – which deals with sales, distribution, and franchise relationships. The chapter specifically deals with sales representative contracts involving commissions. Fla. Stat. § 686.201, in part, provides the following in Subparagraphs 3(a) and 3(b):

> (3)(a) When the contract between a sales representative and a principal is terminated and the contract was not reduced to writing, all commissions shall be paid within 30 days after termination.
>
> (b) In the event a principal fails to comply with the provisions in paragraph (a) the sales representative has a cause of action for damages equal to triple the amount of commission found to be due. The prevailing party in such action is entitled to an award of reasonable attorney's fees and court costs.

22. Although the commission agreement between the parties was reduced to writing, that writing did not address when Alma Lasers was required to pay any remaining commissions due to Anti-Aging upon termination. Therefore, the Sales Representative Agreement is silent on that issue.

23. Alma Lasers failed to comply with Fla. Stat. § 686.201(3)(b) because it failed to pay Anti-Aging the commissions due it within 30 days after terminating Anti-Aging. Accordingly, Anti-Aging, under the Florida statute cited in paragraph 21 of this Count, is entitled to triple the amount of commissions found to be due from Alma Lasers, and is also entitled to an award of reasonable attorney's fees for prosecuting this cause of action.

## COUNT III
## BREACH OF CONTRACT – UNLAWFUL TERMINATION

24. The allegations contained in Paragraphs 1 through 23 above are incorporated into this Count III and are made a part of this Count.

25. Pursuant to the statements contained in Exhibit C to this Complaint, Alma Lasers terminated its Sales Representative Agreement with Anti-Aging for the sole reason that Anti-Aging "failed to maintain the minimum volumes that were established for the Fourth Quarter of Calendar Year 2005 (i.e., a minimum of six (6) systems during October, November and December 2005)." In fact, the parties had not mutually agreed upon a "minimum volume for Product orders" for the Fourth Quarter of 2005. Therefore, Alma Lasers action of terminating the Sales Representative Agreement between it and Anti-Aging was illegal, unlawful, and

constituted a breach of contract with Anti-Aging. As a result, Anti-Aging is entitled to damages consisting of commissions – calculated upon a 23% commission as contained in the Sales Representative Agreement between the parties – that it would have earned on the sale of all products to Sona MedSpas through the completion of the original term of the Sales Representative Agreement, which was to run through June 30, 2006.

WHEREFORE, on Counts I and II of this Amended Complaint, Anti-Aging Solutions, Inc., prays that this Court award it a judgment Alma Lasers, Inc., formerly known as Orion Lasers, Inc., in the principal amount of $250,000.00, plus an award of pre-judgment interest from the date Alma Lasers, Inc. should have made each proper commission payment to Anti-Aging Solutions, Inc. Anti-Aging further requests that the Court triple this award and award Anti-Aging Solutions, Inc. its reasonable attorney's fee for recovering such judgment, pursuant to Fla. Stat. § 686.201. As for Count III of the Amended Complaint, Anti-Aging Solutions, Inc. prays for judgment against Alma Lasers, Inc. in the principal amount of $750,000.00, plus an award of prejudgment interest.

                                                       ANTI-AGING SOLUTIONS, INC.

                                                       /s/                        .
                                          David M. Zobel, Esq.
                                          Virginia Bar No. 23298
                                          Attorney for Anti-Aging Solutions, Inc.
                                          HUFF, POOLE & MAHONEY, P.C.
                                          4705 Columbus Street
                                          Virginia Beach, Virginia 23462
                                          Phone: (757) 499-1841; Fax: (757) 552-6016
                                          E-mail: dzobel@hpmlaw.com

**CERTIFICATE OF SERVICE**

      I hereby certify that on September 10, 2008, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing (NEF) to the following:

    David C. Burton, Esq., dburton@williamsmullen.com
    Jeffrey D. Wilson, Esq., jwilson@williamsmullen.com
    Williams Mullen, P.C.
    222 Central Park Avenue, Suite 1700
    Virginia Beach, VA 23462

and forwarded a copy via U.S. Mail to:

    Kevin David Kelly, Esq., kkelly@lockelord.com
    Locke Lord Bissell & Liddell, LLP
    111 S. Wacker Drive, Suite 4300
    Chicago, IL 60606

                                            /s/                              .
                                      David M. Zobel, Esq.
                                      Virginia Bar No. 65808
                                      Attorney for Anti-Aging Solutions, Inc.
                                      HUFF, POOLE & MAHONEY, P.C.
                                      4705 Columbus Street
                                      Virginia Beach, Virginia 23462
                                      Phone: (757) 499-1841
                                      Fax: (757) 552-6016
                                      E-mail: dzobel@hpmlaw.com